OPINION
{¶ 1} Defendant-appellant, Dennis L. Grier, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty, pursuant to a jury verdict, of voluntary manslaughter in violation of R.C. 2903.03. Defendant assigns a single error:
 {¶ 2} "The trial court committed reversible error and deprived Appellant of due process of law by entering judgment of conviction when Appellant had established that he acted in self-defense." Because the evidence supports the jury's verdict implicitly concluding defendant did not act in self-defense, we affirm.
 {¶ 3} By indictment filed October 12, 2001, defendant was charged with one count of murder in violation of R.C. 2903.02 arising out of the death of George Walker on September 22, 2001.
 {¶ 4} A jury trial commenced on March 18, 2002. According to the state's evidence, on September 22, 2001, Romeka England lived with her three children and her boyfriend George Walker at 5395 Refugee Road. They were tenants of Walker's mother, Patricia Grier, who was married to defendant; both resided in the house. Also living in the house were Patricia's step-daughter, Careese Moore, Patricia's brother, Carl, and J.J. Brown.
 {¶ 5} England testified that, on the morning of September 22, 2001, she asked defendant if she could use his telephone. Defendant cursed at her, refusing her the opportunity. She then told Walker, who confronted defendant. The confrontation led to the first of two arguments that morning. In defendant's bedroom, Walker and defendant talked and argued, but no threats issued. The argument ended when England and Walker walked back toward the den, where they were staying; defendant followed.
 {¶ 6} Walker and England went into the den and Walker sat on the sofa. Defendant came in behind them with a barbeque fork in his hand, telling Walker not to touch his television. Walker said he did not intend to, but was simply getting a tape. When Walker saw defendant had a fork, he hit defendant in the face and knocked the fork out of his hand. Defendant responded by saying that "George stole on him. He was going to call his brother and he was going to have his brother bring him some guns and he was going to kill him." (Tr. 37.) Walker was unperturbed, apparently because he did not believe defendant would call his brother.
 {¶ 7} Defendant went out of the room, and telephoned his brother. Defendant also called his wife, Walker's mother. Patricia wanted to speak to Walker; at that time, Walker was in the den, and defendant was in his bedroom. After Walker had finished speaking with his mother, defendant came back toward the den, talking about how England and Walker had to leave. Defendant further was "calling [Walker and England] dumb bitches, trifling bitches[;] * * * [h]e said when my brother bring a gun, I'm going to kill your punk ass. I'm going to pop, pop, pop, pop * * *. After he said that he was going to kill him, [defendant] said that George's mom was not only going to have one dead son, that she was going to have two because he was going to kill him." (Tr. 40.)
 {¶ 8} After defendant's threats to kill Walker, the two began to fight in the kitchen. Defendant had Walker pinned against the refrigerator when England saw a hurt, surprised look on Walker's face. Defendant and Walker were still fighting, and "then it was blood everywhere." (Tr. 43.) Defendant either slipped on the blood or fell. England called Patricia again to tell her about the incident, and Walker went into the bathroom, apparently to look at his wounds. When he came back, he lay on the floor by the front door. Defendant retrieved his jacket and keys, walked around Walker, and left. Walker died from two stab wounds to the chest. According to the state's evidence, Walker was not armed during the argument.
 {¶ 9} Tia Watson, a friend of Careese Moore, had stayed overnight at the Grier home and heard the argument in defendant's bedroom on the morning of September 22, and her testimony corroborated portions of England's testimony. According to Watson, Walker left defendant's bedroom, and defendant followed him out of the room. When they reached the den, Walker and defendant again began arguing. Defendant had "some type of object in his hand and told [Walker] that if he got in his face again, that he would stab him." (Tr. 102.) In response, Walker punched defendant in his jaw and snatched the weapon out of defendant's hand. Defendant "told him that he got a good shot on him, but that was okay. Then he walked out the den, and he made a phone call, and then he came back in there and was threatening him like, `well, when my pistol gets here, I will shoot you.' " (Tr. 104.) Defendant threatened Walker two or three times. Concerned, Watson called Patricia Grier, who spoke first to defendant, and then to Walker, urging Walker to get out of the house. After Watson hung up the phone, defendant and Walker had more words. Defendant then told Walker he was going to be dead like his brother, and they again began to fight, this time in the kitchen; it ended in Walker's death. Watson also saw nothing in Walker's hands.
 {¶ 10} Defendant testified on his own behalf. While some portions of his testimony were consistent with the state's evidence, other portions differed markedly. Specifically, defendant contends the first argument occurred when Walker threatened defendant in defendant's own bedroom. Nonetheless, when the argument ended, defendant followed Walker. As defendant explained, because defendant was getting ready for a wedding and needed his shoes, defendant was acutely aware that Walker was wearing them. Defendant followed Walker out of defendant's bedroom in order to ask him about the shoes. Walker went into the den, and defendant walked into the kitchen to get water for the purpose of taking medicine. When Walker also came into the kitchen, defendant grabbed a fork. Walker punched defendant, grabbed a knife, and went into the den.
 {¶ 11} Defendant in turn went into his bedroom, as he had been told he was wanted on the telephone. Defendant walked toward his bedroom, but actually was in the kitchen when he spoke on the telephone with Patricia. As defendant talked, he started walking toward the den. When he had concluded his conversation with his wife, defendant called his brother and asked for a gun. Defendant denied ever telling England and Walker he had done so, and he also denied threatening to stab Walker, but he advised Walker "if you continue to hurt me, yes, I will hurt you. I will kill you with a gun." (Tr. 216.) Defendant apparently made the statement in talking to his brother, but loudly enough so that Walker could hear it. Defendant admitted to stating to Walker, "you need to be as dead as your brother." (Tr. 217.)
 {¶ 12} At that point, a second argument ensued. Defendant was heading into the front room and Walker charged him. Walker "grabbed me back, pulled me back, and was punching me viciously to the head and face." (Tr. 220.) Defendant fell, and as he attempted to pull himself up near the stove, he grabbed a knife that was lying on the stovetop. Although defendant saw no knife in Walker's hands, he stabbed Walker twice because of the pain and injury he sustained at the hands of Walker, because he was in fear, and because he needed to escape. After the argument, defendant left.
 {¶ 13} In his single assignment of error, defendant does not dispute that he caused Walker's death. Instead, defendant contends he acted in self-defense. Because the jury did not so conclude, defendant contends that the jury's verdict is against the manifest weight of the evidence. When presented with a manifest weight argument, we engage in a limited weighing of the evidence to determine whether the jury's verdict is supported by sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt. State v. Thompkins (1997), 78 Ohio St.3d 380, 387 ("When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony"); State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387. Determinations of credibility and weight of the testimony remain within the province of the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 14} To justify the use of deadly force in defending himself, defendant was required to show: "(1) the slayer was not at fault in creating the situation giving rise to the affray; (2) the slayer has a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) the slayer must not have violated any duty to retreat or avoid the danger." State v. Robbins (1979), 58 Ohio St.2d 74, paragraph two of the syllabus.
 {¶ 15} Even if defendant's testimony, if believed, would support his claim of self-defense, the evidence before the jury was conflicting on at least one point of the Robbins test: whether defendant was at fault in creating the situation giving rise to the affray. According to defendant, his actions were purely defensive. After the argument in defendant's bedroom, defendant went to the kitchen for water. Given Walker's previous threat, defendant grabbed a fork to defend himself when Walker entered the kitchen. Walker punched defendant, grabbed a knife, and went into the den.
 {¶ 16} Moreover, according to defendant, he did not threaten to kill Walker. Although he admits he spoke with his brother and talked loudly enough for Walker to hear it, he did not specifically state to Walker that he would kill him. Instead, as he was leaving the area of the den, he told Walker he needed to be as dead as his brother. Despite no direct threat, defendant contends Walker charged defendant. To stop the severe beating, defendant, in trying to right himself at the stove, grabbed a knife lying on the stove and stabbed defendant.
 {¶ 17} Nonetheless, the state's evidence portrayed defendant as the aggressor. According England, Walker did not threaten defendant in the first argument. As England and Walker went back toward the den, defendant chose to follow them. While Walker sat in the den, defendant threateningly came in behind them with a barbeque fork in his hand, telling Walker not to touch the T.V. When Walker tried to disarm defendant by knocking the fork out of his hand, defendant's response was angry: he was going to have his brother bring him some guns and he was going to kill Walker. Walker was not upset, apparently believing defendant would not do so.
 {¶ 18} After some intervening telephone calls, defendant again came back to the den and confronted Walker, who had remained in the den. Again, defendant threatened Walker, stating he was going to kill him, gesturing with his hand like a gun, and indicating Walker's mother would have two dead sons because he was going to kill Walker. The fight ensued from those threats. The state's evidence, if believed, indicated defendant pursued Walker, and was responsible for creating the situation that led to the fight in the kitchen.
 {¶ 19} With that conflicting evidence, the jury's prerogative included resolving the credibility issues and determining which witnesses were worthy of belief. The jury chose to believe the testimony indicating defendant was an aggressor, or at least was at fault in creating the situation giving rise to the incident resulting in Walker's death. Moreover, the state presented corroborating witnesses who confirmed various portions of the testimony that indicated defendant was the aggressor. By contrast, defendant was able to produce little in the way of supporting evidence, and in fact suffered some contradiction at the hands of the state's rebuttal witnesses. Under those circumstances, we cannot conclude the jury lost its way in the manner in which it resolved the credibility issues before it.
 {¶ 20} Accordingly, defendant's single assignment of error is overruled, and the judgment of the trial court is affirmed.
Judgment affirmed.
BOWMAN and McCORMAC, JJ., concur.
McCORMAC, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.